# IN THE COURT OF APPEALS OF IOWA

No. 18-0813
Filed June 5, 2019

**IN THE INTEREST OF B.H.A.,**
**Minor Child,**

**J.R., Mother,**
        Petitioner-Appellant,

**M.A., Father,**
        Respondent-Appellee.

_____

Appeal from the Iowa District Court for Floyd County, Karen Kaufman Salic, District Associate Judge.

A mother appeals the district court's denial of her petition to terminate the incarcerated father's parental rights. **AFFIRMED.**

Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, LLP, Charles City, for appellant mother.

Danielle M. DeBower of Eggert, Erb, Kuehner & DeBower, P.L.C., Charles City, for appellee father.

Ann M. Troge, Charles City, guardian ad litem for minor child.

Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

Jordan, the mother of three-year-old B.A., appeals a juvenile court order denying her petition to terminate the parental rights of B.A.'s father, Mark, under Iowa Code chapter 600A (2017). Jordan contends the juvenile court incorrectly concluded termination of Mark's parental rights is not in B.A.'s best interests, even though Mark is incarcerated in another state and will not be released until 2024, has a long history of substance abuse, and was found to have abandoned B.A. Mark defends the order, arguing B.A. should have a chance to know his father.

We find Jordan did not carry her burden of proving termination is in B.A.'s best interests. As the juvenile court concluded, Mark has been addressing his addiction and improving his work and parenting skills while in prison. We are not prepared to dismiss the possibility he will be a positive influence in B.A.'s life—it is in B.A.'s best interests to preserve the relationship, even if Mark cannot assume caretaking duties immediately after being released from prison.

I.      **Facts and Prior Proceedings**

Both of B.A.'s parents struggled with substance-abuse issues. Mark grew up in a household where both his parents used drugs; he began abusing drugs himself at a young age. From about the age of fifteen, he drank alcohol regularly. He also admitted being a daily methamphetamine and marijuana user. Jordan also has a troubled past with substance abuse. After graduating from high school, she worked as a certified nursing assistant, but she developed an addiction to prescription pills. With the help of her parents, she entered two drug-treatment programs and was able to quit. She and Mark met at a party in 2013 and she soon

began using methamphetamine with him. She quit shortly before getting pregnant with B.A. in October 2013.

Although initially excited about becoming a father, Mark was not particularly supportive during the pregnancy: he did not assist financially with Jordan's health care though he was employed at a cleaning company and earning around $1000 per month. He attended just two prenatal appointments. Mark continued abusing drugs throughout Jordan's pregnancy. He also later confessed to distributing drugs during this period. Jordan lived in Charles City with her parents while Mark lived in Mason City. Mark does not have a valid driver's license and had to get rides from friends and family members.

In April 2014, Jordan went into labor at twenty-eight weeks, and B.A. was born in Charles City. He was immediately transferred to the neonatal intensive care unit (NICU) at Mayo Clinic in Rochester, Minnesota. Mark traveled to Rochester with Jordan's parents. Jordan joined B.A. there after she was discharged from the Charles City hospital. B.A. was in the NICU for nine weeks. Jordan remained with him the whole time. Mark visited somewhere between two and six times. Mark testified he was unable to see his son more often because he had to work.

When B.A. was discharged, it was with explicit instruction he not be exposed to any smoke due to his prematurity and related respiratory illnesses. He had regular home-health nurse visits to check on his breathing. Jordan returned to her parents' home with B.A. Eventually, she resumed work and found her own apartment where she now lives with B.A.

Mark took little initiative to see B.A. after he came home from the hospital. Meetings between Mark and B.A. were arranged almost exclusively by Jordan. Jordan offered to bring B.A. to Mason City where Mark lived and invited Mark to visit him at her parents' house in Charles City. Mark visited a handful of times. The minimal visitation was at least partially attributable to Mark's lack of a driver's license. Mark also testified he continued to engage in methamphetamine distribution activities, which led to his federal felony conviction.

Mark provided little financial assistance and attended none of B.A.'s doctor appointments. Mark was not involved in any of B.A.'s specialized medical care resulting from his prematurity. Jordan testified Mark gave her a few packages of diapers and about one hundred dollars when he got a tax refund. Mark testified to providing some support, but admitted after he paid his own expenses, it was only "little bits of money" that "might not have amounted up to a lot." He estimated he contributed about $400.

Although Mark was aware B.A. could not be exposed to cigarette smoke, even the residue on clothing, he continued to smoke and smelled of smoke when he visited B.A. Jordan suspected he was still using marijuana. Jordan offered to bring B.A. for visits at Mark's apartment on weekends. During these visits, Mark occasionally pitched in to help in B.A.'s care, feeding and changing him and letting Jordan sleep in. This pattern of visits went on until December 2014 when Jordan and Mark broke up for good. After their breakup, Mark did attempt to have some contact with B.A. Jordan brought B.A. to Mark's apartment in Mason City for a few hours on weekends. But eventually those visits lessened and then stopped.

Contacts were also sparse in 2015. Once in March, Jordan went to Mark's apartment only to find it reeking of cigarette smoke and occupied by a strange man. She left. Mark attended Jordan's first birthday party in April. On Father's Day, Jordan arranged for Mark to visit B.A. at her parents' house. He arrived late and appeared to be under the influence of a substance, so Jordan asked him to leave.

Finally, in July 2015, Jordan arranged for Mark to make an early-afternoon visit. But he called to say he had fallen asleep. He wanted to come over then, but it was after 6 p.m., and Jordan had plans. Jordan testified Mark threatened to come to her apartment and kill himself on her steps. Jordan called law enforcement to check on Mark, but they released him without any further action. On another occasion, Mark threatened to crash into Jordan's car and "blow his brains out."

July 2015 was the last time Mark saw B.A. Mark testified he kept asking Jordan to see B.A., but she would not let him. In November 2016, Jordan learned through a newspaper article that Mark had been detained on federal drug charges. Mark was sentenced at the end of 2016 to 121 months in federal prison and incarcerated in Fort Worth, Texas. He will not be released until fall 2024, when B.A. will be ten years old. Jordan testified that while he was incarcerated, Mark sent a few letters and called her a few times—in December 2015, in April 2016 for B.A.'s birthday, and in May 2016. Mark sent B.A. birthday cards in 2015 and 2016. He also sent B.A. two drawings.[1]

---

[1] Mark testified he drew Iron Man and "painted it with Skittles" when he was in county jail.

Mark recalled more expansive attempts at communication, testifying he wrote letters in December 2015; February, April, July, August, September, November, and December 2016; and March and July 2017. Mark testified he sent some letters to Jordan's parents because she had been living with them, but Jordan's mother testified they received only one letter at their address, in January 2016. He also testified he had called on several occasions. Jordan said she did not accept many of his calls because she was working. He has not made financial contributions to B.A.'s care since being in prison. Jordan testified Mark did not update her with information about where he was incarcerated or how to contact him. He did not inform her whether it was possible to set up phone calls or video conversations with B.A.

Jordan began a new romantic relationship in May 2016. She offered into evidence photographs of B.A. enjoying activities with her boyfriend, Walker. In September 2017, Jordan gave birth to B.A.'s half-brother, R.J., who is Walker's child. Jordan testified she and Walker are not married or living together and have not talked about taking those steps. Walker is a farmer and contributes about $50 per month to the household for purchases of formula, diapers, and clothing for R.J.

In March 2016, Jordan unsuccessfully petitioned the court to change B.A.'s last name.[2] After Mark's sentencing in December 2016, Jordan filed a petition to terminate his parental rights.

---

[2] To change B.A.'s name, Jordan had to show either (1) Mark abandoned B.A. or (2) Mark had been ordered to contribute financial support to the child and failed to do so without good cause. Because the parents had no custody arrangement, no support order existed, and Mark did not give consent to the name change, the court denied Jordan's request. The court also found, "[T]he lack of contact between [Mark] and [B.A.] is properly attributable more to poor communication and hard feelings between [Jordan] and [Mark]

Mark testified from prison about his efforts at becoming a more capable parent. He completed a parenting class and a twelve-hour drug education class, received a certificate of attendance for Alcoholics Anonymous (AA), and attended Narcotics Anonymous (NA). He enrolled in college classes for an associate's degree. He was working in an electric and metal shop to learn new skills. He testified his support system consisted of his brother, girlfriend, dad, and stepmom. He had not engaged in any mental-health treatment.

When asked why she wanted the court to terminate Mark's parental rights, Jordan explained she does not want B.A. to know his father is in prison and was a drug user and dealer. Jordan hoped one day B.A. would be adopted by someone else. In her estimation, Mark did not participate in caring for B.A. before his conviction and B.A. should not have to endure demands for a father-son relationship when Mark gets out of prison. Jordan testified B.A. has no recollection of Mark as his father. She also testified she does not know what she plans to say if and when B.A. asks about his father. Jordan's mother also testified B.A. does not recognize Mark as someone significant in his life.

To advance her position, Jordan presented expert testimony from a retired family therapist, Jennifer Judson-Harms. Judson-Harms testified about parental bonding and the importance of securing an attachment by age three. In her view, the loss of that early opportunity to create a bond is "very difficult to make up." Given a hypothetical closely matching the events in B.A.'s history, Judson-Harms testified, it would be "very difficult" for the incarcerated parent to establish "a

---

than to any intent on the part of [Mark] to abandon his son." We consider this finding superseded by the district court's later finding that Mark abandoned B.A.

positive, meaningful relationship with that child." When asked what it might be like to have B.A. and Mark reunited after Mark discharges his sentence, Judson-Harms testified much depended on how Jordan handles the absence of Mark from B.A.'s life. The therapist did not testify reuniting with Mark would definitely be detrimental to B.A., but opined it was in B.A.'s best interests to terminate Mark's parental rights even if there was no current plan for B.A. to be adopted by someone else. She advanced, "[T]he best predictor of future behavior is past behavior."[3]

The juvenile court found Jordan proved the abandonment grounds under Iowa Code section 600A.8(3)(b) by clear and convincing evidence. The court noted the grounds for termination existed even before Mark was incarcerated given his lack of contact with B.A. But, the court decided it was not in B.A.'s best interests to terminate Mark's rights:

> [W]ith increasing regularity, the appellate courts are finding that a parent's incarceration and lack of interest in the child pre-incarceration are not grounds for termination, particularly when there is not a father to "step into the shoes" of being a father to the child. The case law continues to expand the concept that maintaining the legal relationship is a benefit to the child, even if the expected relationship between the child and parent will be less than optimal. Essentially, the idea being that an absent parent is better than no parent.
> Obviously, what kind of parent Mark could be in six more years is unknown. He has a troubling and negative history and in some respects is not entirely accepting responsibility for his past actions . . . . Mark certainly has made positive gains while incarcerated: is learning a trade, has been substance free for years and voices a desire to have contact with his son. It is impossible to know if these circumstances will continue once he is released, but if it does—like it did with Jordan when she overcame her addictions—it would not be in [B.A.'s] best interest to rob him of that opportunity.

---

[3] The guardian ad litem neither favored nor opposed termination of Mark's parental rights. She noted Mark was taking steps "to be sure he doesn't relapse" when he is discharged from prison. She believed in years to come, "with counseling," B.A. could develop an "active relationship with Mark."

It is clear that Jordan would not voluntarily allow the two to develop any kind of relationship if Mark did not have legal rights to enforce.

The court denied the petition. Jordan appeals.

## II.    Analysis

We review private-termination proceedings under Iowa Code chapter 600A de novo. *In re Q.G.*, 911 N.W.2d 761, 769 (Iowa 2018). We give deference to the factual findings of the juvenile court, especially those related to witness credibility. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). Such proceedings involve two steps: First, the petition must show clear and convincing evidence one of the grounds warranting termination under Iowa Code section 600A.8 exists. *Q.G.*, 911 N.W.2d at 770. Under Iowa Code section 600A.8(3)(b), a parent is "deemed to have abandoned [a] child," who is

> six months of age or older . . . unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child . . . .
> (2) Regular communication with the child or with the person having the care or custody of the child . . . .
> (3) Openly living with the child . . . .

Because Mark does not contest the abandonment finding, the first requirement is satisfied. *See id.* at 770–71.

As a second step, the petitioner must show by clear and convincing evidence termination of the parent's rights is in the child's best interests. *Id.* at 770; *see* Iowa Code § 600A.1. "The best interest of the child . . . shall be the paramount consideration" in applying chapter 600A, but "the interests of the

parents of this child . . . shall be given due consideration" as well. Iowa Code § 600A.1(1).

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

*Id.* § 600A.1(2). Further guiding our best-interests decisions, "we have . . . borrowed from Iowa Code section 232.116(2) and (3)." *Q.G.*, 911 N.W.2d at 771 (citing *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010)). Those tests direct us to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We also consider whether "the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *Id.* § 232.116(3). "We consider what the future holds for the child if returned to his or her parents." *Q.G.*, 911 N.W.2d at 771.

In finding termination is not in B.A.'s best interests, the district court noted a trend in appellate decisions against reflexively terminating the parental rights of incarcerated parents.[4] On appeal, Mark relies on the recent case *In re Q.G.* to

---

[4] Many such decisions arise in the context of Iowa Code chapter 232 and the reasonable efforts the State is required to make to return the child home. *See, e.g.*, *In re L.M.*, 904 N.W.2d 835, 840 n.9 (Iowa 2017) ("Whether visitation for an incarcerated parent should be ordered as a reasonable effort toward reunification when timely raised by the parent will depend on the circumstances of each case."); *In re L.W.*, No. 18-2007, 2019 WL 1055858, at *2 (Iowa Ct. App. Mar. 6, 2019); *In re R.B.*, No. 18-0146, 2018 WL 3057881, at *2 (Iowa Ct. App. June 20, 2018) (Tabor, J., concurring specially); *In re A.R.*, No. 17-

suggest it would not be in the best interests of a child to be deprived of the opportunity to have a relationship with a parent who is incarcerated. *Id.* at 761. In *Q.G.*, the father was sent to federal prison on firearms charges. *Id.* at 764–65. In a private-termination proceeding, the mother sought severance of his rights to two children on multiple grounds, including abandonment.[5] *Id.* at 763–64. The supreme court reversed the termination on the best-interests step stating, "[W]e are not ready to write off [the father's] potential positive contributions to his sons' lives." *Id.* at 774.

The supreme court's analysis in *Q.G.* suggests we should not be too quick to find termination of an incarcerated parent's rights is in the child's best interests under chapter 600A. Unlike terminations under chapter 232, in private terminations, the juvenile court is not concerned with establishing permanency after the State removes a child from his or her parents. *Compare* Iowa Code § 232.104(2), *with* Iowa Code §§ 600A.1(2), .9; *see also In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (describing distinctions between chapters 232 and 600A and stressing "the child's safety and need for a permanent home are paramount

---

1712, 2018 WL 347759, at *2 (Iowa Ct. App. Jan. 10, 2018); *In re S.J.*, 620 N.W.2d 522, 524–25 (Iowa Ct. App. 2000). "If the state seeks to use a parent's failure to achieve reunification as the grounds for termination, it has an obligation to provide reunification services to the parent." *L.M.*, 904 N.W.2d at 841 (Cady, C.J., dissenting) (citing *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000)). By contrast, in a private termination, the petitioning parent has no duty to ensure the other parent has a relationship with the child. Iowa Code § 600A.8(3)(c) ("In making a determination [that a parent has abandoned a child under this code section] the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified" in the abandonment section). Therefore, the reasonable-efforts cases are inapposite here.

[5] The district court's order was based on abandonment and a crime against a child—the father was convicted of child endangerment after he assaulted the mother while she was holding one of the children. *Q.G.*, 911 N.W.2d at 768 (citing Iowa Code § 600A.8(3), (9)). The father did not challenge the finding of a crime against a child, and the court did not address the abandonment issues. *Id.* at 770–71.

concerns" under chapter 232). If a meaningful relationship can be reestablished when the noncustodial parent is released from prison, it may be in the child's best interests to maintain the legal tie. *See Q.G.*, 911 N.W.2d at 774.

The supreme court did not adopt "a formulaic or rule-bound approach" to balancing the factors relevant to determining the best interests of the child under chapter 600A. *Id.* at 771. "[C]aselaw has limited utility. Each case must be decided on its own facts." *Id.* But *Q.G.* does illuminate relevant factors to weigh—including the incarcerated parent's overall criminal record, substance-abuse history, mental health, job prospects, and any parenting neglect or inexperience—along with any measures taken while in prison to address perceived deficits. *Id.* at 771–72. The *Q.G.* court also considered any minimization of responsibility or blame-shifting by the incarcerated parent. *Id.* at 772. The court gave weight to the closeness of the parent-child bond, and chronicled the incarcerated parent's attempts to communicate with the children while behind bars. *Id.* The supreme court recognized "[a]nother factor to consider is the fact that a stepfather is willing to provide for the children's needs and is willing to adopt the children." *Id.* The court likewise discussed the family support system available to the incarcerated parent. *Id.* at 773. And, although not identifying the anticipated duration of incarceration as a discrete factor, the court noted the father's possible release date. *Id.* at 764.

Applying those factors in *Q.G.*, the supreme court was clear-eyed about the father's "checkered past," including his history of addiction, mental-health impairments, and domestic violence (including child endangerment). *Id.* at 772. The court believed the father had minimized his responsibility for his actions. *Id.*

The court also noted the lack of a meaningful bond between the father and the children, especially the younger child. *Id.*

But the court returned to the biological father's "fervently stated interest in resuming a relationship with his children upon his release from prison." The *Q.G.* court was persuaded by his model prison record, his commitment to participating in services, and his plan upon release to line up a construction job and live with his parents—both of whom would provide structure and support for his reentry into society and his children's lives. *Id.* at 773. The court concluded the mother did not show by clear and convincing evidence termination was in the children's best interests:

> It is clear [the father] loves his children and strongly desires to continue as their father. Although contact has been quite limited during the past few years due to [the father]'s incarceration, the children remain quite young and may benefit from years of exposure to their father upon his release from prison. [The father]'s loving, extended family offers the prospect of meaningful support for the children. . . .
> Under the totality of circumstances, we are not ready to write off [the father]'s potential positive contributions to his sons' lives. We therefore conclude that [the mother] has not proved by a clear and convincing preponderance of the evidence that [the father]'s parental rights should be terminated. We note, however, that any future relapse of involvement with drugs or violence may well tip the balance in any future termination action.

*Id.* at 774.[6]

---

[6] Since *Q.G.*, our court has weighed the identified factors, as well as other relevant considerations, in determining a child's best interests under chapter 600A when a parent is incarcerated. *See, e.g.*, *In re B.C.*, No. 18-1442, 2019 WL 1300456, at *5 (Iowa Ct. App. Mar. 20, 2019) (affirming denial of petition to terminate rights of incarcerated mother when child's guardians prevented mother from having a relationship with child); *In re G.M.*, No. 18-0280, 2018 WL 4361041, at *2 (Iowa Ct. App. Sept. 12, 2018) (affirming termination of incarcerated father's rights in light of his five felony convictions, drug history, and lack of progress in treating addiction, and where stepfather cared for child for three years and wished to adopt); *In re L.T.*, No 17-1862, 2018 WL 3912142, at *1 (Iowa Ct. App. Aug. 15, 2018) (affirming termination where father was in prison for sexually abusing

Turning to the instant case, we find notable similarities with and differences from the critical facts in *Q.G.* On the similarity side, both fathers faced a long-standing substance addiction that ultimately led them to prison. *See id.* at 771. While in prison, the father in *Q.G.* completed parenting and anger-management classes, and attended NA faithfully. *Id.* at 767. Mark has engaged in similar programming to better himself while in federal custody. Both fathers made efforts to communicate with their children while incarcerated. *See id.* at 772. In *Q.G.*, the father was initially held in the Hancock County jail, during which time he visited with the children, gave the children presents, recorded audio books, sent cards, and had phone conversations with the children. *Id.* at 765. Once in prison, his contact with the children was restricted because they were registered victims of his crimes. *Id.* Likewise trying to stay connected, Mark has sent letters, birthday cards, and drawings to B.A., demonstrating a continued interest in the child.[7]

As for differences, where the father in *Q.G.* lived with the children before being incarcerated and provided some of their care, Mark did not have custody of his son and did not spend much time caring for B.A. on his own. *See id.* at 763. The father in *Q.G.* also appeared to have more reliable extended family lined up

---

three daughters); *In re A.T.*, No. 17-1570, 2018 WL 2727799, at *4 (Iowa Ct. App. June 6, 2018) (affirming termination of incarcerated father's parental rights where father had limited involvement with children and little prospect existed for building a better relationship after father assaulted children's mother in front of them); *In re C.T.*, No. 17-1695, 2018 WL 2731640, at *2 (Iowa Ct. App. June 6, 2018) (affirming termination of father's parental rights where father failed to provide financial support, had sporadic visitation, and one visitation resulted in a founded child abuse report).

[7] Jordan is critical of a reference in Mark's letter to B.A. being his "flesh and blood." The full passage read: "Little man, you're getting pretty big. Can't believe next month is your birthday, turning the big 3-0, Dude. I'm sorry I won't be around for a few of them but does not mean I'm not thinking about you all the time. You're my son, my flesh and blood, and I'll always love you." We see nothing nefarious in Mark's sentiments.

"to provide additional support for his parenting activities." *Id.* at 773. Whereas here, Mark's aunt had maintained contact with B.A., but the record did not show the other family members Mark listed as his "support system" could be viable caregivers for B.A. Another significant distinction is the age of the children and the length of the father's sentence: in *Q.G.*, the children were one and four, and the father was slated for release just one year after the hearing. *Id.* at 764. Here, Mark will be in prison until 2024; B.A. will be ten years old and—if no visitation is arranged—will not have seen Mark in over seven years.

Jordan pushes for termination now, rather than waiting to see if Mark can form a bond with B.A. in the future. Mark responds Jordan has not carried her burden and claims he can still be a positive influence in B.A.'s life.

Mark does not dispute the finding he abandoned B.A. In his testimony, he took responsibility for his actions, telling the court: "No one forced me to take the road that I did." He admitted he would not be able to make up for lost time, but testified he would "love to be able to be there for my son when I get out."

The juvenile court credited Mark's testimony he wants to maintain a relationship with his son. Reason for optimism exists in Mark's recent efforts: he is addressing his substance-abuse issues by faithfully attending AA and NA. He has completed a parenting class. Despite the obstacle of incarceration, he is trying to establish and maintain a place of importance in B.A.'s life.

That place of importance includes the fulfillment of financial obligations. In that vein, we find it significant Mark is learning trade skills he can rely on for stable employment when he is released. Termination of Mark's parental rights would deprive B.A. of potential financial assistance from his father. *See H.S.*, 805

N.W.2d at 746 ("[C]hild support . . . [is] a valid consideration in termination proceedings under chapter 600A."). Mark is working to give himself better job opportunities after prison, and it serves B.A.'s interest to preserve Mark's obligation to support his child.

As a final best-interests factor, we examine the possibility a step-parent will in the future want to adopt B.A. (a hypothetical situation requiring another proceeding to terminate Mark's rights). *See Q.G.*, 911 N.W.2d at 772. In this case, absence of a stepparent waiting in the wings does not weigh heavily against Jordan's case—she has been raising B.A. on her own with negligible financial support from Mark or Walker.[8]

All things considered, we are not "ready to write off" the good that could come from B.A. maintaining his legal relationship with Mark. *See Q.G.*, 911 N.W.2d at 774. Even though Mark is not scheduled for release for five plus years, B.A. will still be young when Mark is released and has time to enjoy a closer father-son relationship if Mark stays on this positive path. Mark's ability to assume the duties of parenting B.A. has been hampered by his substance abuse and somewhat by Jordan's (albeit understandable) exasperation with Mark's lackluster efforts. But Mark has consistently expressed an interest in remaining a part of B.A.'s life.

Even though the father and son must wait several years to renew their normal interactions, the family therapist did not believe a reunion with Mark would

---

[8] The marginal importance of this factor can be gleaned from its application in *Q.G.*, where the supreme court decided termination of the biological father's parental rights was not in the children's best interest even though the mother had remarried and the stepfather wished to adopt the children. *See* 911 N.W.2d at 767.

necessarily be a traumatic experience for B.A. On this record, we conclude preserving Mark's parental rights works in B.A.'s best interests. But we echo the *Q.G.* court's warning a future relapse into old patterns will tip the balance toward termination. *Id.* at 744. We conclude Jordan did not prove by clear and convincing evidence it is in B.A.'s best interests to terminate Mark's parental rights at this time.

**AFFIRMED.**

Potterfield, J., concurs; Vaitheswaran, P.J., dissents.

**VAITHESWARAN, Presiding Judge.**  (dissenting)

I respectfully dissent.  The majority thoroughly summarizes *In re Q.G.*, 911 N.W.2d 761 (Iowa 2018), and the factors weighing for and against termination of Mark's parental rights.  Applying those factors, I would conclude Mark's parental rights should have been terminated.

Mark testified that he was sentenced to a federal prison term of 121 months, had been continuously incarcerated since December 1, 2015, and, as of the termination hearing, was "sitting at just under seven years left" without consideration of certain reductions.  *Cf. Q.G.*, 911 N.W.2d at 768 (noting possible release in 2017, subject to completion of separate federal sentence and any halfway house requirements).  He stated he "never really had treatment" for drug or alcohol dependency before his incarceration, despite a history of drug dependency dating back to 2003 or 2004.  *Cf. id.* at 771 (noting three years of addiction to methamphetamine).  He lacked a supportive family environment to cushion him on his release.  *Cf. id.* at 768, 774 (noting father planned to live with his parents "on his release," and the parents provided a "supportive environment").  He acknowledged there was "probably" no way his child knew him or was attached to him at the time of the termination hearing.

I recognize the court in *Q.G.* declined to terminate the father's parental rights despite the absence of a meaningful bond with his children.  *See id.* at 772.  But, in my view, the prospects for resurrecting that bond were greater in *Q.G.*, where the parents stipulated that "upon [the father's] release from prison, the district court [could] consider terms and conditions of visitation."  *Id.* at 773.  The court noted "the desirability of allowing the recent stipulated agreement of the

parties to play out before the district court." *Id.* We are not faced with this unique factor.

I would reverse the denial of the termination petition and remand for entry of an order granting Jordan's termination petition.